**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 24-CV-09842 (MFK) |
| v. | <u>**ORAL ARGUMENT REQUESTED**</u> |
| CUMBERLAND DRW LLC, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
<u>**DEFENDANT'S MOTION TO DISMISS**</u>

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

*Counsel for Cumberland DRW LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

I.      Crypto Assets and Blockchain Technology .................................................................. 4

II.     Primary- Versus Secondary-Market Transactions ....................................................... 4

III.    Regulation of Crypto Assets ......................................................................................... 5

IV.    Cumberland ................................................................................................................. 10

ARGUMENT ......................................................................................................................... 11

I.      The SEC Fails To Plausibly Allege That Cumberland Transacted In Securities. ........... 11

    A.    The SEC has not plausibly alleged that the Cumberland Transactions involve an "investment of money" that is "pooled" in a "common enterprise." ........................... 13

    B.    The SEC fails to plausibly allege that Cumberland's counterparties had an expectation of profits based on the efforts of others. .................................................. 20

    C.    The SEC fails to plausibly allege that any unidentified token transactions are "investment contracts." .............................................................................................. 29

II.     The SEC Fails To Plausibly Allege That Cumberland Is A Dealer. ................................. 30

    A.    Cumberland's On-Exchange Trading is Not Dealing. ................................................. 32

    B.    The Complaint Fails to Plausibly Allege Cumberland's Counterparty Trading is Dealing ..................................................................................................................... 33

III.    The Major Questions Doctrine Requires Dismissal of the Complaint. ........................... 35

IV.    The SEC's Enforcement Action Violates Cumberland's Due Process Rights. ............... 38

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Alabama Assoc. of Realtors v. Dept. of Health & Human Servs.*,
594 U.S. 758 (2021) ...................................................................... 35, 38

*Allison v. Ticor Title Ins. Co.*,
907 F.2d 645 (7th Cir. 1990) .................................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................ 11

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ............................................................................ 35

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) .................................................................. 30

*Chapel Invs., Inc. v. Cherubim Ints., Inc.*,
177 F. Supp. 3d 981 (N.D. Tex. 2016) ...................................... 31, 32, 33

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ................................................................................ 39

*Coinbase Inc. v. SEC*,
2025 WL 78330 (3d Cir. Jan. 13, 2025) ........................................ Passim

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................................................ 37

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ................................................................................ 38

*Federated All. Grp., Inc.*,
1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) ........................................ 34

*Fortyune v. City of Lomita*,
766 F.3d 1098 (9th Cir. 2014) ................................................................ 39

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) .................................................................... 5

*Giger v. Ahmann*,
2013 WL 6730108 (N.D. Ill. Dec. 20, 2013) .......................................... 23

*Goodman v. Epstein*,
582 F.2d 388 (7th Cir. 1978) ............................................................ 13, 28

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ................................................................. 26

*Hirk v. Agri-Research Council, Inc.*,
    561 F.2d 96 (7th Cir. 1977) ................................................................. 14, 19

*Hocking v. Dubois,* 885 F.2d 1449 (9th Cir. 1989)
    885 F.2d 1449 (9th Cir. 1989) ................................................................. 18, 24

*In re Immune Pharms. Inc.*,
    635 B.R. 118 (Bankr. D.N.J. 2021) ................................................................. 32

*Kemmerer v. Weaver*,
    445 F.2d 76 (7th Cir. 1971) ................................................................. 15, 23

*Lanzetta v. New Jersey*,
    306 U.S. 451 (1939) ................................................................. 39

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ................................................................. 15

*Milnarik v. M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir. 1972) ................................................................. 13, 21

*Nat'l Ass'n of Priv. Fund Mgrs. v. SEC*,
    2024 WL 4858589 (N.D. Tex. Nov. 21, 2024) ................................................................. 32

*Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*,
    150 F. Supp. 3d 1219 (D. Nev. 2015) ................................................................. 32

*Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*,
    698 F.2d 320 (7th Cir. 1983) ................................................................. 12, 21, 37

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) ................................................................. 21, 26

*Salameh v. Tarsadia Hotel, Corp.*,
    726 F.3d 1124 (9th Cir. 2013) ................................................................. 13, 24

*SEC v. Almagarby*,
    92 F.4th 1306 (11th Cir. 2024) ................................................................. 33

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ................................................................. 24

*SEC v. Binance Holdings. Ltd.*,
    2024 WL 3225974 (D.D.C. June 28, 2024) ................................................................. Passim

*SEC v. Coinbase, Inc.*,
    2025 WL 40782 (S.D.N.Y. Jan. 7, 2025) ................................................................. 19

*SEC v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024) ................................................................. 16, 19

*SEC v. ETS Payphones, Inc.*,
  408 F.3d 727 (11th Cir. 2005) ................................................ 17

*SEC v. Keener*,
  102 F.4th 1328 (11th Cir. 2024) ............................................. 33

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) ................................................. 23

*SEC v. Payward*,
  2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ........................... 17

*SEC v. Ripple Labs*,
  682 F. Supp. 3d. 308 (S.D.N.Y. 2023) ............................... Passim

*SEC v. Terraform Labs PTE. Ltd.*,
  684 F. Supp. 3d 170 (S.D.N.Y. 2023) ........................... 19, 20, 38

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) .......................................................... Passim

*Secon Serv. Sys. Inc. v. St. Joseph Bank & Trust Co.*,
  855 F.2d 406 (7th Cir. 1988) ....................................... 12, 23, 28

*Stenger v. R.H. Love Galleries, Inc.*,
  741 F.2d 144 (7th Cir. 1984) ................................................. 13

*Swanson v. Citibank, N.A.*,
  614 F.3d 400 (7th Cir. 2010) ........................................... 11, 30

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967) ............................................................. 12

*United Hous. Found., Inc. v. Forman*,
  421 U.S. 837 (1975) .................................................. 20, 26, 28

*Venture Associates Corp. v. Zenith Data Systems Corp.*,
  987 F.2d 429 (7th Cir. 1993) ................................................. 34

*Wals v. Fox Hills*,
  24 F.3d 1016 (7th Cir. 1994) .......................... 12, 13, 14, 15, 21

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ....................................................... 35, 37

*Williamson v. Curran*,
  714 F.3d 432 (7th Cir. 2013) ................................................... 5

*Woodward v. Terracor*,
  574 F.2d 1023 (10th Cir. 1978) ............................................. 26

*XY Plan Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ........................................... 31, 33

**Statutes**

7 U.S.C. § 1a(18)(xi) and (v) ........................................................................ 10

15 U.S.C. § 78c(a)(10) .................................................................................. 12

15 U.S.C. § 77b(a)(1) .................................................................................... 12

15 U.S.C. § 77h(a) ........................................................................................... 8

15 U.S.C. § 78c(a)(5) .................................................................................... 31

**Rules**

Federal Rule of Civil Procedure 8 ............................................................... 30

Federal Rule of Civil Procedure 12(b)(6) ................................................... 11

# PRELIMINARY STATEMENT

Over the past several years, the Securities and Exchange Commission ("SEC") has pursued a scorched-earth enforcement campaign against the crypto-asset industry, premised on the claim that almost every crypto asset is inherently an "investment contract" and thus a "security" under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").  As one federal court recently observed, the SEC is, quite literally, taking on the entire "industry through litigation – case by case, coin by coin, court after court . . . risk[ing] inconsistent results that may leave the relevant parties and their potential customers without clear guidance."  *SEC v. Binance Holdings. Ltd.*, No. 23-cv-01599, 2024 WL 3225974, at *11 (D.D.C. June 28, 2024).

Cumberland DRW LLC ("Cumberland") is the SEC's latest stop on this reckless regulation-by-enforcement campaign trail.  But unlike many other crypto cases the SEC has pursued, this is not a fraud case.  It is not a manipulation case.  Indeed, the SEC does not allege that Cumberland has caused any specific harm to anyone.  Rather, the SEC alleges that, for the past six years, Cumberland purchased and sold five crypto assets (the "Third-Party Tokens" or "Tokens") almost exclusively with sophisticated entities in the secondary market as investment contracts (the "Cumberland Transactions") without registering as a dealer.  And the SEC makes these allegations without mentioning that it has made registering to trade crypto assets impossible.[1]

---

[1] In fact, in an abundance of caution and despite the fact that it does not believe the crypto-asset transactions in which it engages constitute securities transactions, Cumberland's parent company purchased a registered broker-dealer in 2019 and attempted to obtain approval for it to trade crypto assets.  *See* Compl. ¶¶ 9–10 (noting the registered broker-dealers owned by Cumberland's parent company, which include this purchased broker-dealer).  But that entity has remained dormant because the SEC has made it unworkable to register to trade crypto assets other than Bitcoin and Ether.  *See infra*, p. 28 & n.32.  Thus, Cumberland is being sued here for failing to register despite the fact that the SEC has denied it from doing exactly what the SEC asks it to do through this enforcement case.

The SEC's suit is premised on flawed legal theories, and it must be dismissed. To start, Cumberland's secondary-market transactions are not investment contracts. In its seminal decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court defined "investment contract" as an investment relationship in which the investor contributes capital to be pooled with that of other investors in a common enterprise, and the developer assumes a commitment to use that capital to generate returns that the investors will share. *Howey* and its progeny distilled that investment contract arrangement into a multi-prong test: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits from the efforts of others. If any prong of this test is not met, there is no investment contract and thus no security.

Critically, and as the SEC has been forced to admit elsewhere, a crypto asset is not itself an investment contract and thus is not a security. Rather, the Supreme Court and the Seventh Circuit are clear: whether something constitutes an "investment contract" requires analyzing the facts and circumstances of the specific transaction at issue, including the expectations of the parties involved. The SEC's Complaint, though, is premised on the repeatedly rejected theory that once a crypto asset is sold as an investment contract in an initial sale, all subsequent transactions of the crypto asset are investment contracts in perpetuity. Not so. The Court must apply the *Howey* test to the specific Cumberland Transactions alleged in the Complaint. When one does so, it is apparent that the SEC has not plausibly alleged that the Cumberland Transactions are investment contracts.

*First*, Cumberland's counterparties are not providing capital to be invested in a common enterprise. They are purchasing from Cumberland, not from the Tokens' developers, and Cumberland is not pooling counterparties' funds for the purpose of funneling proceeds to the developers. And the SEC has not alleged that any relationship exists between Cumberland and the developers that would lead a purchaser to expect such an arrangement. Under binding Seventh

Circuit precedent, without such pooling (or at least the expectation of it), there is no common enterprise. *Second*, neither Cumberland nor the Tokens' developers have made any commitments to undertake efforts to earn Cumberland's counterparties a profit, much less to use such counterparties' funds to do so. No investor-investee relationship is created in a Cumberland Transaction. Cumberland and its counterparties merely pay one another consideration for the *assets* they are trading, as with a transaction in any commodity. The SEC attempts to plead around these economic realities to shoehorn the Cumberland Transactions into the statutory definition of a security. Its attempt falls flat.

The Complaint's shortcomings do not end there. In attempting to cast Cumberland as a "dealer," the SEC ignores historical precedent establishing that dealers buy and sell regularly in the service of customers, rather than for their own self-interest. Further, separation of powers and due process principles deal fatal blows to the SEC's suit. The SEC is prosecuting firm after firm for failing to register under Section 15(a) while simultaneously making it impossible to register to trade crypto assets, in an apparent attempt to suffocate the crypto-asset industry.[2] This Court should presume that if Congress intended to institute such a consequential policy, it would say so. It has not, and thus the major questions doctrine forecloses this suit. Finally, the SEC's enforcement in the absence of any meaningful regulatory guidance, particularly on how to register under Section 15(a), violates Cumberland's due process rights. As explained further below, for these reasons, the Court should dismiss the SEC's Complaint.

---

[2] Contemporaneous with this suit, the SEC is seeking similar injunctive relief against the largest crypto-asset exchanges in the United States on registration-based claims. *See SEC v. Coinbase*, No. 23-cv-04738 (S.D.N.Y. June 6, 2023); *SEC v. Binance*, No. 23-cv-01599 (D.D.C. June 5, 2023); *SEC v. Payward* ("*Kraken*"), No. 23-cv-06003 (N.D. Cal. Nov. 11, 2023).

# BACKGROUND

## I.     Crypto Assets and Blockchain Technology

This case involves the purchase and sale of "crypto asset[s]," which also are commonly referred to as "tokens," "cryptocurrencies," "virtual currencies," "digital assets," or digital "coins." Compl. ¶ 16.  Crypto assets are computer code that can be transferred using the "blockchain"—a technology that records transactions on a decentralized, digital ledger that is spread across a network of computer servers.  *Id*. ¶¶ 16, 17.  These computer servers independently record, maintain, and verify transactions involving crypto assets.  *Id*. ¶¶ 17, 21.  Blockchain technology eliminates the need for a centralized gatekeeper like a bank and replaces it with a public, unalterable ledger that records transactions.

Thousands of crypto assets circulate on various blockchains.  The SEC's Complaint identifies five specific crypto assets—MATIC (now POL), SOL, ATOM, ALGO, and FIL—all developed by token developers who are not parties to this action.  *Id*. ¶¶ 74, 75.  These crypto assets, like many, have a wide range of consumptive uses.  *E.g.*, Compl. ¶¶ 100, 120 (MATIC: facilitating participation on decentralized apps); *id.* ¶¶ 122; 140 (SOL:  paying transaction fees on energy efficient, fast blockchain); *id.* ¶ 147 (ATOM:  paying transaction fees to mitigate spam); ¶ 209 (FIL:  increasing computing storage).

## II.     Primary- Versus Secondary-Market Transactions

Crypto assets can be sold in primary or secondary transactions.

***Primary-market transactions in crypto assets***.  A crypto asset's developer or founder often will sell crypto assets directly to purchasers in initial sales—called "initial coin offerings" ("ICOs"), "initial exchange offerings" ("IEOs"), "crowdsales," or "public 'token sales.'"  *Id.* ¶ 24. Such sales can be to the public at large, to institutional investors, or through other offers of tokens. *E.g., id*. ¶¶ 104, 124–25.  In conjunction with these sales, the crypto asset's developer will often

4

release literature about the crypto asset, sometimes called a "white paper," where it may describe what the developer intends to do with the proceeds raised from the sales. *See*, *e.g.*, *id.* ¶ 100.

*Secondary-market transactions in crypto assets.* After their initial sale, some crypto assets can also be resold on the secondary market. This includes trading on third-party trading platforms, including crypto-asset "exchanges," or direct party-to-party trading, known as "over-the-counter" trading. When trading on crypto-asset exchanges, purchasers and sellers do not know with whom they are transacting—a matching engine automatically matches them with another purchaser or seller on an anonymous basis.[3] When trading over the counter, parties trade off-exchange with one another directly and thus know the identity of their counterparty.

## III.    Regulation of Crypto Assets[4]

Over the last several years, the SEC has made confusing and often conflicting statements regarding its enforcement jurisdiction over the crypto-asset industry.

*The SEC's Initial Guidance.* From 2008, when Bitcoin was first invented, to July 2017, the SEC offered no public guidance at all on whether crypto-asset transactions qualified as securities transactions within the SEC's jurisdiction. Then, on July 25, 2017, the SEC issued a report of investigation analyzing the DAO Token's ICO and advised that the offering was subject to the federal securities laws because the token was an "investment contract." Compl. ¶ 28; U.S. SEC Report of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act: The DAO, Exch. Act

---

[3] *See*, *e.g.*, Compl. ¶¶ 81–82, 108–110, 115, *Kraken*, No. 23-cv-06003 (N.D. Cal. Nov. 11, 2023), ECF No. 1; Compl. ¶ 97, *SEC v. Coinbase*, No. 23-cv-04738, (S.D.N.Y. June 6, 2023), ECF No. 1 ("[N]either the buyer nor the seller knows the identity of the counterparty to the trade[s]" on platforms where orders are matched via a "matching engine."); *see also SEC v. Ripple Labs*, 682 F. Supp. 3d. 308, 317–18 (S.D.N.Y. 2023) (observing that sales on crypto-asset trading platforms "were blind bid/ask transactions").

[4] Courts may examine information outside of the complaint "that is subject to proper judicial notice" when considering a motion to dismiss. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Williamson v Curran*, 714 F.3d 432, 443 (7th Cir. 2013) (noting that "this circuit has taken a relatively expansive view of the documents that a district court properly may consider in disposing of a motion to dismiss").

Rel. No. 81203 (July 25, 2017), https://tinyurl.com/k8r9xczu (the "DAO Rep."). The DAO Report provided that assessing whether a particular transaction fell within the securities laws required token developers to analyze the "facts and circumstances" of the transaction. DAO Rep. at 10, 17–18. It provided no objective criteria that parties trading in the secondary market could apply to secondary-market transactions to determine whether those trades involved the sale of investment contracts.

***Secondary-Market Confusion.*** The SEC's public statements and actions following the DAO Report sent mixed messages about the scope of the SEC's purported regulatory remit over crypto assets, particularly regarding secondary-market trading. To illustrate just a few:

- **June 14, 2018**: The SEC's then-Director of the Division of Corporation Finance, William Hinman, stated that a "token . . . all by itself is not a security" and posited that whether a crypto-asset transaction involves a security can change with the passage of time based on events extrinsic to the asset.[5]

- **April 3, 2019**: The SEC Staff released a framework providing *more than 60 factors* to consider when assessing whether a crypto-asset transaction qualifies as an "investment contract." The framework cautioned that it represented the views only of the SEC's "Strategic Hub for Innovation and Financial Technology," that it was "not a rule, regulation or statement of the Commission," and that it did "not replace or supersede existing . . . statements or guidance from the Commission," including the Hinman Speech.[6]

- **May 6, 2021**: Discussing whether the Exchange Act gives the SEC authority over secondary-market, crypto-asset trading, the SEC's current Chair, Gary Gensler, testified before Congress that "right now the exchanges trading in these crypto assets *do not have a regulatory framework* either at the SEC, or our sister agency, the Commodity Futures Trading Commission . . . there is not a market regulator around these crypto exchanges."[7]

- **August 5, 2021**: Chair Gensler told a member of Congress that the legislative priority should regarding crypto assets center on secondary-market trading and requested "additional plenary

---

[5] *See* William Hinman, Director, *SEC Div. Corp. Fin., Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto* (June 14, 2018), https://tinyurl.com/3mprs4vv ("Hinman Speech").

[6] *See* SEC Div. Corp. Fin, *Framework for "Investment Contract" Analysis of Digital Assets*, at n.1, https://tinyurl.com/d5fkcxfn.

[7] *See Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Virtual Hr'g. Before the U.S. H. Fin. Servs. Comm. on Agric.*, 117th Cong. at 11–12 (May 6, 2021), https://tinyurl.com/4w8s63n6 (emphasis added) ("Game Stopped Hr'g").

authority to write rules for and attach guardrails" to such trading, thus again acknowledging that crypto-asset, secondary-markets did not have a regulatory framework.[8]

Three months after Chair Gensler's May 2021 congressional testimony, the SEC flip-flopped. Despite Chair Gensler's comments that exchange trading in crypto assets lacked a regulatory framework, the SEC brought an enforcement action against a crypto-asset trading platform for failing to register. The unfairness of the action took one Commissioner by surprise:

> Given how slow we have been in determining how regulated entities can interact with crypto, market participants may understandably be surprised to see us come onto the scene now with our enforcement guns blazing and argue that Poloniex was not registered or operating under an exemption as it should have been.

*See* Hester M. Peirce, Comm'r, Statement: *In re Poloniex, LLC* (Aug. 9, 2021), https://tinyurl.com/yuw8a6z2. Commissioner Peirce further noted that even if the platform wanted to register as a broker-dealer or a securities exchange, it likely could not. *See id.* ("Sure, Poloniex could have tried to register as a securities exchange or, more likely, as a broker-dealer to operate an alternative trading system (ATS). . . Had it done so, it likely would have waited . . . and waited . . . and waited some more.").

***The SEC's Whiplashing Secondary-Market Enforcement Campaign.*** When secondary-market participants asked the SEC for clarity, the SEC refused to give it and instead embarked on a brazen enforcement quest against secondary-market crypto-asset exchanges. In 2022, for example, the secondary-market, crypto-asset exchange Coinbase, Inc. petitioned the SEC to resolve the confusion and promulgate rules clarifying how and when the federal securities laws apply to crypto assets, explaining that the now-existing framework is "both incomplete and

---

[8] Letter from SEC Chair Gensler to Senator Elizabeth Warren at 1, 3 (Aug. 5, 2021), https://tinyurl.com/t3rct3cy ("Gensler Letter").

unsuitable" for crypto assets, which makes compliance "effectively impossible."[9] The SEC denied

the petition.[10] In 2023, the SEC accelerated its regulation-by-enforcement agenda to target

additional secondary-market actors, including Coinbase and other of the industry's largest and

most established, for failing to register.[11] In multiple of its enforcement actions, and at odds with

its prior guidance, the SEC appeared to argue that a crypto asset itself is inherently a security and,

once issued as a security, remains so in perpetuity, including when purchased and sold on the

secondary market. The SEC's Chair Gary Gensler made similar proclamations to the public,

including his view that "everything other than Bitcoin" is a security.[12] As explained below,

multiple courts have rejected this theory, forcing the SEC to purport to abandon it.[13]

And just this week, on January 13, 2025, the Third Circuit granted, in part, Coinbase's

petition for a writ of mandamus regarding its 2022 petition. *See Coinbase Inc. v. SEC*, No. 23-

3202, 2025 WL 78330, *1 (3d Cir. Jan. 13, 2025) ("*Coinbase III*"). The Third Circuit did not buy

the SEC's "vacuous" reasoning for denying Coinbase's petition—that, *inter alia*, the regulatory

framework is workable. *Id.* at *17. Accordingly, the Circuit held that the SEC's "conclusory"

decision was "arbitrary and capricious" and ordered the SEC to provide a more reasoned analysis

---

[9] *See* Letter from Paul Grewal to Vanessa A. Countryman, SEC Secretary, regarding Petition for Rulemaking – Digital Asset Securities Regulation, at 1, 13 (July 12, 2022), https://tinyurl.com/yx4t2xcr.

[10] *See* Letter from Vanessa A. Countryman, SEC Secretary, on behalf of SEC, to Paul Grewal regarding Petition for Rulemaking, File No. 4-789 (Dec. 15, 2023), https://tinyurl.com/yc822j4m.

[11] *See supra*, n.2 (citing enforcement actions against Coinbase, Binance, and Kraken). In 2023, the SEC sued Coinbase for failing to register as a national securities exchange notwithstanding the fact that, just two years earlier, it had accelerated the effectiveness of the registration statement for the initial public offering of Coinbase's common stock—an action requiring a finding that the offering was in the public interest. *See* 15 U.S.C. § 77h(a).

[12] *See* Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s top financial cop on Bankman-Fried blowback*, New York Magazine: Intelligencer (Feb. 23, 2023), https://tinyurl.com/yfmzk7nm.

[13] On the same day it disclaimed in a federal court filing the view that a crypto asset is itself a security, the SEC issued a press release and settlement in a different matter premised on its prior theory and using the term "crypto asset security." *Compare* note 20, *infra*, with Order Instituting Cease and Desist Procs. at 4, *In re eToro USA LLC*, Rel. No. 101001 (Sept. 12, 2024), https://tinyurl.com/mrky75ba.

of its refusal to promulgate new rules with respect to crypto assets. *Id*. at *1, 17. Judge Stephanos Bibas wrote a scathing concurrence highlighting how the SEC's "old regulations fit poorly with this new technology, and its enforcement strategy raises constitutional notice concerns" that, as the majority also acknowledged, would be salient in an enforcement proceeding. *Id.* at *20–29 (Bibas, J., concurring); *see id.* at *10 (recognizing that there may be "fair-notice concerns," but they are "properly raised in individual enforcement actions").

    ***The Catch-22.*** Contemporaneous with the SEC's enforcement activity, Chair Gensler made overtures to secondary-market intermediaries to just "come in" and "register."[14] Despite his invitation, however, registering to trade crypto assets remains practically impossible because, among other impediments, the crypto assets themselves cannot be registered as required for broker-dealers to trade them, and custody rules require broker-dealers to maintain "physical possession" of the security, which is impossible for crypto assets. *See Coinbase III*, 2025 WL 78330, at *4 (outlining the impediments to registration compliance); *id*. at *27 (Bibas, J., concurring) (noting that "Cumberland . . . tried to work with the SEC to broker crypto assets" and "accepted Chairman Gensler's invitation to 'come in and register,' but after registering they were told that they could not deal in any crypto assets except Bitcoin and Ether"). To this day, the SEC has refused to provide any clarity on *how* to register as a broker or dealer to trade crypto assets under the Exchange Act. *See id*. (Bibas, J., concurring) ("The SEC repeatedly sues crypto companies for not complying with the law, yet it will not tell them how to comply."); Hester M. Peirce and Mark Uyeda, Comm'rs, Statement: On Today's Episode of As the Crypto World Turns:

---

[14] Chair Gary Gensler, *Remarks at SEC Speaks: Kennedy and Crypto* (Sept. 8, 2022), https://tinyurl.com/exf9fcdb (invitation to registrants); CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today, CNBC (Feb. 10, 2023), https://tinyurl.com/2s3zec6e ("Gensler CNBC Statement") (suggesting registration is just filling out forms on the SEC's "website").

Statement on ShapeShift AG (Mar. 5, 2024) (lamenting that the SEC precludes crypto-asset trading firms from registering as broker-dealers, then brings enforcement actions when they fail to do so, exposing market participants to perpetual ambiguity and a "regulatory sword of Damocles").[15] Thus, Cumberland finds itself in a Catch-22: not permitted to "come in and register" (or to use its registered broker-dealer affiliate) as Chair Gensler invites, yet sued for failing to do so.

## IV.    Cumberland

Cumberland is a crypto-asset trading firm that has operated for more than ten years. Compl. ¶ 30. Cumberland is not an issuer, promoter, or developer of any crypto assets. Nor is it an exchange. Rather, it trades as principal, meaning that it buys and sells crypto assets for itself, rather than on behalf of or for customers. Cumberland transacts through different methods—it trades directly with sophisticated counterparties and on third-party exchanges. *Id.* The SEC alleges that, since at least March 2018, Cumberland has acted as a "dealer." *Id.* ¶¶ 1–2, 73–74.

***Trading Directly with Cumberland.*** Cumberland trades directly with approved sophisticated counterparties, namely high-net-worth individuals and institutions like investment firms, hedge funds, and multi-national investment banks. *Id.* ¶ 32.[16] Cumberland does not trade directly with retail counterparties. To trade directly with Cumberland, an individual or entity must demonstrate certain financial qualifications, and Cumberland must approve the individual or entity as a counterparty. *Id.* ¶ 40. Counterparties can trade with Cumberland over the telephone, instant

---

[15] *See also* Daniel M. Gallagher, *Test. Before the U.S. House of Reps. Fin. Servs. Subcomm. on Digital Assets,* (Sept. 18, 2024), https://tinyurl.com/58phpd76 (explaining that the SEC will not grant regulatory relief necessary for crypto-asset exchanges and market participants to register under the Exchange Act).

[16] Cumberland's website publicly lists some of its counterparties. *See Representative Counterparty Testimonials*, Cumberland, https://www.cumberland.io/ (revealing testimonial from Goldman Sachs, among others). These and Cumberland's other counterparties meet the "eligible contract participant" standard under the Commodity Exchange Act—a far more stringent standard of sophistication than the "accredited investor" definition under the U.S. securities laws. *See* 7 U.S.C. § 1a(18).

messaging, or Skype ("Call-In" trading). *Id.* ¶¶ 45–47. Since 2019, counterparties also can use "Marea," an electronic, online interface that connects them to Cumberland's "API," or they can connect directly to Cumberland's API.[17] *Id.* ¶¶ 31, 48. Cumberland's counterparties know they are trading directly with Cumberland when trading through these methods. *See id.* ¶¶ 30, 40, 65.

**Trading on Third-Party Platforms.** Separately, Cumberland also trades on crypto-asset exchanges, where it executes proprietary-trading strategies for its own interest. *Id.* ¶¶ 69–72. Cumberland's trading on third-party exchanges is anonymous, just like that of every other exchange participant.

## LEGAL STANDARD

Cumberland moves to dismiss the SEC's Complaint under Federal Rule of Civil Procedure 12(b)(6), which requires that a complaint plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 570 (2007)). Although the Court must accept Plaintiff's factual allegations as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion, as are "abstract recitations of the elements of a cause of action." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010). Such allegations do not suffice to provide defendants with fair notice of a claim's basis or allow a court to determine whether the facts before it are "plausible." *Swanson,* 614 F.3d at 404–05. A complaint that fails to meet the Rule 12(b)(6) standard—as the SEC's does here—must be dismissed.

## ARGUMENT

I.   **The SEC Fails To Plausibly Allege That Cumberland Transacted In Securities.**

The Court should dismiss the SEC's Complaint because it fails to plausibly allege the

---

[17] The Complaint uses the term API but does not define it. API stands for "Application Programming Interface," which is a program that allows different software applications to communicate with one another.

threshold issue: that Cumberland traded *securities*. Congress vested the SEC with the authority to regulate the market for securities only. It does not have the power to regulate the market for any and all items in which someone may invest, whether it be commodities (e.g., gold, silver, or wheat) or other items that may rise or fall in value (e.g., limited-edition Nike shoes or baseball cards). The SEC's attempt to regulate Cumberland's secondary-market transactions in crypto assets is an overreach of its regulatory authority that has no basis in law nor any limiting principle.

The SEC alleges that, in transacting in the Third-Party Tokens, Cumberland is buying and selling "investment contracts"—a phrase included in the statutory definition of "security." *See* 15 U.S.C. § 77(b)(a)(1); *see id.* § 78(c)(a)(10).[18] Neither the Securities Act nor the Exchange Act defines an "investment contract," but decades ago, in *Howey*, the Supreme Court defined the phrase in a manner consistent with the common understanding of a security—i.e., a commercial arrangement where investors provide capital to a common enterprise with the expectation that their collective funds will be used by the enterprise's developer or promoter to earn profits. 328 U.S. 293 (1946).[19] *Howey*, for example, involved the sale of orange grove plots coupled with a management contract, which allowed out-of-town investors "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise." *Id*. at 299. Thus, *Howey* defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a

---

[18] The Securities Act, 15 U.S.C. § 77b(a)(1), and the Exchange Act, 15 U.S.C. § 78c(a)(10), define "security" somewhat differently, but the definitions are construed as though they are identical. *See Tcherepnin v. Knight,* 389 U.S. 332, 335–36 (1967); *Secon Serv. Sys. Inc. v. St. Joseph Bank & Trust Co.,* 855 F.2d 406, 411 n.5 (7th Cir. 1988).

[19] The Seventh Circuit has also reiterated that an investment contract shares the functional characteristics of a security. *See Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 324 (7th Cir. 1983) ("The term 'investment contract' is a catch-all to bring within the securities acts interests that have the functional attributes of stock and other formal securities but are not so denominated."); *Wals v. Fox Hills*, 24 F.3d 1016, 1018 (7th Cir. 1994) (recognizing that the statutory language of "investment contract" has "the limited purpose of identifying unconventional instruments that have the essential properties of a debt or equity security").

common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–99. Courts have since articulated *Howey*'s standard as a three-prong test requiring "(1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits produced solely by the efforts of others." *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984).

The "investment contract" analysis requires a transaction-specific analysis that looks to the "actual facts and circumstances of the particular investment arrangement." *Goodman v. Epstein*, 582 F.2d 388, 406 (7th Cir. 1978). Thus, under *Howey*, the Court must analyze the circumstances of the specific transaction alleged to constitute an investment contract, rather than simply looking to whether an earlier-in-time sale of that asset constituted an investment contract. *See Salameh v. Tarsadia Hotel, Corp.*, 726 F.3d 1124, 1131–32 (9th Cir. 2013) (requiring an investment contract's elements be satisfied at the time of the particular transaction). Here, as explained below, the SEC fails to plausibly allege that the Cumberland Transactions satisfy *Howey*'s requirements.

A. **The SEC has not plausibly alleged that the Cumberland Transactions involve an "investment of money" that is "pooled" in a "common enterprise."**

Whether analyzed under the "investment of money" or the "common enterprise" prong, the Complaint fails to allege that counterparties to the Cumberland Transactions invested their money in a "common enterprise." To establish these elements, the Seventh Circuit requires strict "horizontal commonality," meaning a pooling (i.e., combining) of investor funds "not only between the developer or promoter and each individual investor but also among the investors." *Wals v. Fox Hills*, 24 F.3d 1016, 1018 (7th Cir. 1994) (internal quotation marks and citation omitted) (requiring, "in short, a wheel and not just a hub and a spoke"); *see also, e.g., Stenger*, 741 F.2d at 146 ("This Circuit has strictly adhered to a 'horizontal' test of common enterprise, under which multiple investors must pool their investments and receive *pro rata* profits."); *Milnarik v.*

13

*M-S Commodities, Inc.*, 457 F.2d 274, 275 (7th Cir. 1972) (Stevens, J.) (holding that an individual investor account did not involve the required pooling).

The pooling of funds among investors in the developer's common enterprise (as capital) is a critical requirement because *Howey*'s test is intended to capture "schemes devised by those who seek *the use* of the money of others on the promise of profits." *Howey*, 328 U.S. at 299 (emphasis added); *see Wals*, 24 F.3d at 1019 (rejecting the argument that the horizontal commonality requirement is merely "formalistic"); *see also Binance*, 2024 WL 3225974, at *16 ("The case law points to whether the proceeds of the offering were 'pooled' as a critical aspect of analysis."). The Seventh Circuit has declined to apply the less-exacting standard adopted in other Circuits, known as "vertical commonality," which finds that a common enterprise exists if "the fortunes of all investors are inextricably tied" to the developer or enterprise. *See*, *e.g.*, *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 100 (7th Cir. 1977) (declining to adopt the Fifth and Ninth Circuits' standard of vertical commonality) (citation omitted); *Wals*, 24 F.3d at 1018 ("Our circuit's position comports better, we believe, with the purpose of the 1933 Act than that of the circuits which dispense with the requirement of establishing horizontal commonality.").

Here, the SEC's Complaint fails to allege that proceeds from Cumberland's transactions with counterparties were pooled with the funds of other investors in a common enterprise with the developer of any of the Third-Party Tokens. Indeed, the SEC does not allege that the proceeds from the Cumberland Transactions were pooled at all, a flaw fatal to the Complaint. As alleged in the Complaint, the Cumberland Transactions were all trades in crypto assets on the secondary market. Counterparties purchased their desired crypto assets *from Cumberland*—not from the crypto assets' developers or promoters. *See*, *e.g.*, Compl. ¶¶ 31–32, 95–227. The SEC does not allege (nor could it) that Cumberland pooled counterparties' funds and then funneled that money

14

back to the developer or promoter.  In fact, the SEC does not allege that Cumberland sent *any* money to the developers or promoters of the Third-Party Tokens.  In short, the SEC has not pled any facts to support the notion that Cumberland pooled its purchasers' funds "among [other purchasers]" and with "the developer or promoter."  *Wals*, 24 F.3d at 1016.  As explained below, (1) the SEC cannot cure its failure to allege a "common enterprise" with respect to the Cumberland Transactions by alleging an earlier-in-time common enterprise at the point of the Tokens' initial sales; and (2) recent decisions finding that the SEC sufficiently pled horizontal commonality are inapposite.

1. **The SEC cannot cure its failure to allege a "common enterprise" with respect to the Cumberland Transactions by alleging a common enterprise at the time of the crypto assets' initial sales.**

Clearly unable to allege pooling with respect to the Cumberland Transactions, the SEC's Complaint instead focuses on a purported common enterprise, and alleged pooling, between the token developers and the original purchasers at the point of a token's initial sale.  Indeed, the SEC spends over a dozen paragraphs alleging that token developers initially sold the tokens to purchasers *directly* and pooled the proceeds of those sales.  *See*, *e.g.*, Compl. ¶¶ 106, 108, 124–25, 127–28, 148, 153–54, 168–69, 197–98, 201–02.  In a transparent attempt to bootstrap the secondary-market Cumberland Transactions onto these prior sales, the SEC further alleges, in conclusory fashion, that the Third-Party Tokens were each "offered and sold as an investment contract *since inception*."  *See* Compl. ¶ 76 (emphasis added).

But allegations about what the Tokens' developers did with proceeds of initial sales directly to purchasers are not relevant to whether the subsequent Cumberland Transactions are investment contracts.  *See Howey*, 328 U.S. at 298.  The SEC alleges that developers of the five Third-Party Tokens raised and pooled capital from retail purchasers at the following times:  2017 (ATOM & FIL); 2018 (MATIC/POL & SOL); and 2019 (ALGO).  *See* Compl. ¶¶ 102, 124, 127, 148, 171,

201–202. Yet, Cumberland did not begin trading these tokens until well after—*years* in most cases—those original sales: Cumberland did not begin trading ATOM until two years after its initial sales, MATIC/POL and SOL until three years after their such sales, and FIL until four years after. *See* Compl. ¶¶ 110, 135, 158, 206. And the SEC does not allege Cumberland facilitated any of these sales (regardless of when they began selling) on behalf of the developers. Therefore, no reasonable purchaser from Cumberland could have even conceivably expected that developers were pooling their purchase proceeds (through Cumberland or otherwise) based on developers' statements made well in advance.

Courts have repeatedly rejected the notion that a secondary-market transaction necessarily constitutes an investment contract simply because an initial sale may have satisfied the investment contract test. *See, e.g.*, *Binance*, 2024 WL 3225974, at *20–22 ("Insisting that an asset that was the subject of an alleged investment contract is itself a 'security' as it moves forward in commerce and is bought and sold by private individuals on any number of exchanges, and is used in any number of ways over an indefinite period of time, marks a departure from the Howey framework[.]"). The Court likewise should reject that claim.

Crucially, as the SEC has admitted elsewhere,[20] a crypto asset in and of itself is not a security. Rather, a crypto asset, in certain circumstances, may be the *subject* of an investment contract, depending on the economic realities of and expectations of the parties to a particular transaction. *See SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023) ("*Ripple Labs I*") ("[A] digital token, is not in and of itself a 'contract, transaction[,] or scheme' that

---

[20] *See SEC v. Coinbase*, 726 F. Supp. 3d 260, 280 (S.D.N.Y. 2024) ("[T]he SEC does not appear to contest that tokens, in and of themselves, are not securities."); Tr. of Jan. 17, 2024 Oral Arg. at 21:11, *SEC v. Coinbase,* No. 23-cv-04738, ECF No. 101 (SEC Staff admitting the "token itself is not the security"); *see also* SEC's Mem. of Law ISO Mot. for Leave to Am. Compl. at n.6, *Binance*, 1:23-cv-01599, ECF No. 273-1 (Sept. 12, 2024) (acknowledging that crypto assets are not inherently securities and stating that "the SEC regrets any confusion it may have invited" by using terms that indicated otherwise).

embodies the *Howey* requirements of an investment contract."); *Binance*, 2024 WL 3225974, at *11 ("In the Court's view, then, the SEC's suggestion that the token is 'the embodiment of the investment contract,' as opposed to the subject of the investment contract, muddied the issues before the Court [and] ignored the Supreme Court's directive that the analysis is supposed to be based on the entire set of understandings and expectations surrounding the offering."); *see also*, *e.g.*, *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 732–33 (11th Cir. 2005) (scheme involving sale-leaseback of payphones was an investment contract, without suggesting that the payphones themselves were securities); *Kemmerer v. Weaver,* 445 F.2d 76, 79–80 (7th Cir. 1971) (sales of "live breeding beaver[s]" plus service agreements for their care was an investment contract, without suggesting that the beavers themselves were securities).

While the Complaint abandons this critical distinction, the Court should not. Here, the Court should separately examine secondary sales of the Tokens, like the Cumberland Transactions, from initial sales of the Tokens. *See Howey*, 328 U.S. at 298; *see also Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."); *Ripple I*, 682 F. Supp. 3d at 328–29 & n.16 (analyzing primary and programmatic sales on a crypto-asset exchange distinctly and holding that the latter did not constitute investment contracts because, *inter alia*, "a Programmatic Buyer stood in the same shoes as a secondary-market purchaser who did not know to whom or what it was paying its money"); *SEC v. Payward*, No. 23-cv-6003, 2024 WL 4511499, at *11 (N.D. Cal. Aug. 23, 2024) ("*Kraken*") (holding that primary- and secondary-market sales of crypto assets should be analyzed separately); *Binance*, 2024 WL 3225974, at *20 (explicitly adopting the *Ripple Labs I* analysis). Using that approach, the SEC has not plausibly alleged that the *secondary*-market Cumberland Transactions

are investment contracts merely because *primary-market* transactions in the Tokens may, at one time, have qualified as investment contracts.[21]

*Hocking v. Dubois* is instructive. 885 F.2d 1449, 1462 (9th Cir. 1989) (*en banc), cert. denied*, 494 U.S. 1078 (1990). There, plaintiff Hocking purchased a rentable condo from its first owners via his real estate broker Dubois *(*i.e., Hocking did not buy directly from the resort's developers). Shortly thereafter, Hocking entered into a rental pool agreement with the resort's rental pool operator, an option Dubois informed him of at the time of sale. When Hocking later lost the condo for failure to make a balloon payment, he sued his real estate broker alleging that his condominium purchase and the rental pool agreement together constituted an unregistered investment contract transaction. Sitting *en banc*, the Ninth Circuit observed that had the plaintiff "purchased the condominium and the rental pool directly from the developer and an affiliated rental pool operator"—i.e., in a primary offering—he "would have purchased a security." *Hocking*, 885 F.2d at 1456. However, Hocking "purchased in the secondary market" from a reseller. *Id.* The Ninth Circuit expressly rejected a "*per se* rule" that all secondary sales were investment contracts because the "rental pool 'option' exist[ed]" in the primary offering, instead remanding and requiring that the offering to Hocking be analyzed independently of the primary offering. *Id.* at 1462. In other words, the resale of an asset once purchased as an investment contract is not necessarily itself an investment contract. Indeed, in *Allison v. Ticor Title Ins. Co.*, the Seventh Circuit (Easterbrook, J.) suggested that the secondary sale of an asset under these circumstances should not constitute a "security" at all. 907 F.2d 645, 649 (7th Cir. 1990).

---

[21] Indeed, analyzing secondary transactions on their own, separate and apart from primary sales, is consistent with the securities laws' statutory framework. Through passage of the Securities Act of 1933 and the Securities Exchange Act of 1934, Congress itself recognized that the primary and secondary securities markets, respectively, should be regulated differently.

### 2. Recent decisions finding that the SEC sufficiently pled horizontal commonality are inapposite.

The few cases where courts have held that horizontal commonality may have existed for secondary-market transactions in crypto assets are not persuasive given the "strict horizontal commonality" standard in this Circuit. In *Coinbase I*, for example, the Court rejected any distinction between primary- and secondary-market sales and held that the SEC plausibly alleged a common enterprise at the motion to dismiss phase because "[i]f the development of the token's ecosystem were to stagnate, all purchasers of the token would be equally affected and lose their opportunity to profit." 726 F. Supp. 3d at 291.[22] But, as explained above, under binding Seventh Circuit law, the fact that purchasers' fates are tied together is not enough to establish horizontal commonality and a common enterprise. The Seventh Circuit confronted this precise issue in *Hirk*, where the plaintiff attempted to plead around the Seventh Circuit's pooling requirement by arguing that investors' profits "ebbed or flowed [together] uniformly." 561 F.2d at 101. The Seventh Circuit affirmed dismissal of the complaint, finding it insufficient on its face because "the necessary pooling remains unshown." *Id*. Indeed, if pooling were not required, then any number of ordinary commodities sales could constitute investment contracts. For example, gold purchasers' fortunes rise and fall together as the price of gold increases and decreases, just like holders of a particular crypto asset.

Similarly, while the court in *Terraform Labs* found that the SEC had plausibly alleged horizontal commonality, that was because the SEC alleged that the defendant, who was the *issuer* of the token, pooled the proceeds from the sale of its crypto assets and represented that proceeds

---

[22] And even then, recognizing its opinion might be wrong, the Coinbase court granted Coinbase's motion for interlocutory appeal, staying the case and permitting the Second Circuit to review its decision that Coinbase's secondary-market transactions qualify as investment contracts. *See SEC v. Coinbase*, No. 23-cv-04738, 2025 WL 40782 (S.D.N.Y. Jan. 7, 2025) ("*Coinbase II*").

would be used to benefit all purchasers.  *See SEC v. Terraform Labs PTE. Ltd.*, 684 F. Supp. 3d 170, 195–96 (S.D.N.Y. 2023).  As the *Terraform Labs* court noted, the SEC alleged "that sales from purchases of *all* crypto-assets—no matter where the coins were purchased—would be fed back into the Terraform blockchain and would generate additional profits for all crypto-asset holders."  *Id*. at 198 (emphasis in original).[23]  There are no similar allegations here.  And Cumberland did not issue the Third-Party Tokens, or any other tokens for that matter.  Furthermore, the *Terraform Labs* court declined to consider primary- and secondary-market transactions distinctly, which is required under the Seventh Circuit's transaction-specific analysis, as discussed above.  Here, the SEC's allegations do not establish that Cumberland's counterparties, whether through Call-In, on Marea, or on an exchange, invested in a common enterprise, much less that their assets were pooled together in furtherance of such an investment.  That alone dooms the SEC's Complaint.[24]

### B.      The SEC fails to plausibly allege that Cumberland's counterparties had an expectation of profits based on the efforts of others.

The SEC's Complaint fails for another reason: it does not plausibly allege that Cumberland's counterparties had a "reasonable expectation of profits" based predominantly on the efforts of the developers or promoters of the Third-Party Tokens.  *See United Hous. Found., v. Forman*, 421 U.S. 837, 839 (1975).  Here, the critical question is whether the expected profit comes from efforts of others *financed by* the purchaser's investment, i.e., a profit-sharing enterprise that

---

[23] It is unclear how sales from *all* crypto assets would have been diverted back to Terraform.  Nevertheless, the court was obligated to consider the SEC's allegation as true at the motion to dismiss stage.

[24] The SEC also does not and could not allege that *Cumberland's* funds were pooled with the developer or promoter when Cumberland *purchased* the Third-Party Tokens from its counterparties.  This precludes any finding that Cumberland purchased investment contracts.  Critically, the broker-dealer definition requires, *inter alia*, that one be engaged in the business of both buying *and* selling securities. 15 U.S.C.§ 78c (a)(5)(A).

the purchasers have jointly entered with developers. *See*, *e.g.*, *Howey*, 328 U.S. at 298 (clarifying that an investment contract requires "the placing of capital or laying out of money in a way intended to secure income or profit from its employment") (emphasis added); *Milnarik,* 457 F.2d at 279 n.7 (7th Cir. 1972) (Stevens, J.) ("The investors *provide the capital* and share in the earnings and profits; the promoters manage, control and operate the enterprise." (quoting *Howey*, 328 U.S. at 300) (emphasis added)). Asking only whether Cumberland's counterparties expected someone else's efforts to increase the Third-Party Token's value, as the Complaint suggests, e.g., ¶¶ 112, 160, the SEC jettisons (again) *Howey*'s clear distinction between standalone assets and investment contracts. *See Howey*, 328 U.S. at 297–98; *Ripple I*, 682 F. Supp. 3d at 324.

Moreover, integral to this element of *Howey* is that purchasers derive their expectation of profits from a commitment by the developer that gives rise to an investor-investee relationship. *See Howey*, 328 U.S. at 299–300 (promoter not only sold orange groves, but also *contracted to* manage the lots after they were purchased); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11–12 (1st Cir. 1993) (finding interest in property not a security without post-purchase managerial efforts or commitments); *see also Binance*, 2024 WL 3225974, at *10 n.4 (an "offering at issue [i]s not a security," even if the offeror "encouraged the buyers to anticipate future growth and development," as long as the offeror "did not promise to do anything to help achieve th[e] goal themselves"). This requirement makes sense: the coupling of an asset with such a commitment is what transforms the sale of an orange grove into an investment in an orange-growing company. Without that coupling, an orange is just an orange, not the subject of an investment contract. *See, e.g., Howey*, 328 U.S. 299–300; *Ripple*, 682 F. Supp. 3d at 324 ("[A] digital token, is not in and of itself . . . an investment contract"). It is that additional commitment that creates an investor-investee relationship and what makes an "investment contract" share the "the essential properties

21

of a debt or equity security." *Wals*, 24 F.3d at 1018; *see also Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 324 (7th Cir. 1983) (same).

Here, even accepting the SEC's allegations as true, the SEC has not plausibly alleged any facts that support (or even suggest) that Cumberland's counterparties expected the funds from their purchases would finance third-party efforts to earn them a profit. Nor has it identified any commitment from any Third-Party Token developer to Cumberland's counterparties.

1. **The Complaint does not allege Cumberland's counterparties expected to profit from the efforts of others financed by their purchase proceeds.**

The SEC cannot plausibly allege that counterparties purchasing from Cumberland expected that their purchase proceeds were being invested as capital to finance the efforts of others to earn them a profit. Cumberland's counterparties via Call-In and Marea know they are transacting with Cumberland, not the developers of the Third-Party Tokens. And Cumberland's exchange-purchaser counterparties are buying in blind bid-ask secondary-market transactions and thus have no expectation that the funds will go to a Third-Party Token's developers to finance efforts to earn profits for such counterparties.

Similar facts led the U.S. District Court for the Southern District of New York to conclude that sales on third-party exchanges by token developer Ripple Labs (Ripple's "programmatic sales") did not satisfy the expectation of profits prong because purchasers bought the tokens in blind bid-ask transactions and therefore did not know whether their proceeds were going to Ripple Labs or some other seller. *See Ripple Labs I*, 682 F. Supp. 3d at 328. As the *Ripple* court explained, investors could not "reasonably expect[] that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP." *Id.* In other words, to satisfy this prong of *Howey*, purchasers must expect that the money they pooled *in* a common enterprise will be *used* to generate shared profits on their behalf. *See Binance*, 2024 WL

3225974, at \*14 (explaining that "profits" means a share of earnings or capital appreciation "realized from use of the investors' funds" or "from the development of" the purchaser's initial investment).

The *Ripple* Court's decision applies with equal, if not greater, force here. As explained above, the circumstances of Cumberland's trading—whether anonymously on exchanges or directly with counterparties—leave no room to argue that Cumberland or its counterparties reasonably expect that their purchase funds are being used to generate profits on their behalf.

### 2. The Complaint does not allege any commitments from developers to secondary-market purchasers that create an investor-investee relationship.

The SEC has not alleged that the Third-Party Token developers made any commitments to Cumberland's secondary-market purchasers, thereby creating an investor-investee relationship between them. This is a critical requirement under the statute. As Judge Easterbrook has explained, "all of the items" enumerated in the definition of security, including "investment contract," are *liabilities*. *Secon Serv. Sys., Inc. v. St. Joseph Bank & Tr. Co.*, 855 F.2d. 406, 410–11 (7th. Cir. 1988). The defined items reflect the holder's ownership interest or a claim to assets and a corresponding *obligation* on behalf of the issuer. Indeed, stocks and bonds retain the characteristics of securities when sold in the secondary market because contractual rights travel with those instruments, creating an obligation from the issuer to the purchaser (an "investor-investee" relationship). A purported investment contract must include that same corresponding obligation, or commitment, to qualify as such.[25] Here, though, none of the alleged statements are

---

[25] Some circuits impose an even stricter requirement that the commitment involve post-purchase efforts. *See, e.g.*, *SEC v. Life Partners, Inc.*, 87 F.3d 536, 545 (D.C. Cir. 1996) (noting that post-purchase efforts are the activities "most obviously relevant to the question whether a promoter is selling a 'security'"); *see also Giger v. Ahmann*, No. 09-cv-4060, 2013 WL 6730108, at \*4–5 (N.D. Ill. Dec. 20, 2013) (examining the post-purchase requirement).

commitments by the Third-Party Token developers to secondary-market purchasers that would create an investor-investee relationship and investment contract.[26]

### a. *Statements made to initial token purchasers*

As explained above, the SEC's Complaint attempts to bootstrap Cumberland's secondary-market transactions with sophisticated counterparties on to statements made by Token developers to the initial purchasers of the Tokens. Dozens of the Complaint's allegations are devoted to the developers' statements to the public in connection with initial offerings that occurred, in many instances, *years* before Cumberland ever traded the asset in question.

For example, the Complaint alleges that, in 2019, Polygon conducted its first public sales of MATIC, after releasing a 2018 Whitepaper that stated Polygon "would pool investment proceeds through *its* private and public fundraising *to develop and grow its business*." Compl. ¶¶ 100, 104, 106 (emphasis added). Yet, the SEC acknowledges that Cumberland did not trade MATIC on Marea until September 2021. *Id.* ¶ 110. These statements regarding developers' fundraising efforts published *years* before the relevant purchases cannot reasonably be construed as commitments from the developers to Cumberland's counterparties. *See, e.g.*, *Salameh*, 726 F.3d at 1131–32

---

[26] Even if the public statements cited in the Complaint could be construed as commitments, the SEC has not pled that such statements reached Cumberland's counterparties and motivated their purchase. *See Hocking*, 885 F.2d at 1462 (*en banc* panel withdrawing the panel's prior decision and remanding on grounds that the transaction-specific nature of *Howey* requires analysis of how the arrangement was "promoted *to the investor*," including his "intentions and expectations" (emphasis added)); *Salameh*, 726 F.3d at 1131–32 (finding plaintiffs failed to allege the sale of a security because they did not allege that promotional materials were provided to purchasers at the time of sale). The SEC simply makes the conclusory allegation that public statements by issuers and promoters "would have led objective investors to reasonably view the offer to purchase or sell" investment contracts, Compl. ¶ 78, and that such statements have led objective investors to invest in, and "reasonably to expect profit from, [the developer's efforts]." *Id.* ¶¶ 112, 137, 160, 184, 208. This is not enough to plausibly allege this element. *See SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (holding that the "efforts of others" element was not satisfied where profits expected and realized by "coin buyer depended upon the fluctuations of the gold market, not the managerial efforts of" a mining company); *Ripple I*, 2023 WL 4507900, at *12 ("[A] speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract.'").

(finding purchaser had no expectation of profit because of the large time gap between purchase of condominiums and promotional material); *Binance*, 2024 WL 3225974, at *42 n.15 (rejecting the SEC's argument that developer representations made at initial issuance travel with the token). Again, this is simply the SEC's veiled attempt to revive its now-defunct "once an investment contract, always an investment contract" theory. *See supra*, p. 8.

Even putting aside the significant time gap, a developer's commitments to primary purchasers do not have any bearing on Cumberland's purchases and sales on the secondary market. There is no privity or similar connection between the developers who made the initial statements and the secondary-market buyers. The developers' purported commitments to initial purchasers do not create "an investment relationship" with all purchasers down the line. *See Kemmerer*, 445 F.2d at 79–80 (finding an investment contract because the arrangement "clearly contemplate[d] an *investment relationship*, whereby the individual investors placed their money in the expertise of the defendants who would provide everything to make that investment grow" (emphasis added)); *Ripple Labs I*, 682 F. Supp. 3d at 328–30 (holding there was no "expectation of profits" even where the alleged issuer was a party to the trade because there was no investor-investee relationship between the developer and purchasers via the anonymous trade). The SEC does not allege that Polygon committed to Cumberland's counterparties that it would generate a profit for them. In other words, even if Polygon's commitments to its original purchasers created an investor-investee relationship between *them*, there is no concomitant investor-investee relationship between Polygon and Cumberland's purchasers. The same is equally true of the other Third-Party Tokens named in the Complaint.

### b. *Ongoing statements about the "superiority" of a token network*

The SEC also alleges that the developers "regularly encouraged" public purchasers to

"expect profits" from the developers' efforts, selectively quoting out-of-context statements about how the networks' superiority would increase demand for (and the value of) the token. *See, e.g.*, Compl. ¶¶ 111–13 (MATIC); *id*. ¶¶ 139–40 (SOL); *id*. ¶¶ 161–62 (ATOM); *id*. ¶184 (ALGO); *id*. ¶¶ 208–16 (FIL). But the alleged statements themselves demonstrate how thin the SEC's argument is. For instance, the alleged statements by ATOM's developer Interchain Foundation ("ICF") simply describe the growth and potential of the Cosmos ecosystem and ICF's "expertise in developing blockchain networks"—they do not reflect that ICF *committed* to undertake efforts to earn secondary-market purchasers a profit. Such general, non-committal statements do not give rise to an expectation of profits sufficient to form an investment contract. *See, e.g.*, *Woodward v. Terracor*, 574 F.2d 1023, 1024–25 (10th Cir. 1978) (concluding that a developer's sale of residential real estate plots does not create an investment contract where the developer had advertised the community would eventually become a "self-sufficient community" but undertook no obligation to the purchasers to develop that community); *Rodriguez*, 990 F.2d at 11–12 (no promises to develop); *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (holding the test for an investment contract "is not fulfilled when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services").

The same is true for similar statements by the developers of FIL—a *utility* token that its holders can *use* to rent data-storage space—about the developers' expertise and benefits of the FIL network, which enhance FIL's *utility* for consumptive use, a clear sign that FIL is not a security. *See* Compl. ¶¶ 221–24; *Coinbase III*, 2025 WL 78330, at *24 (Bibas, J., concurring) (explaining that FIL is a "utility token" and any analogy to a security is "strained because the token also entitles [holders] to a service"); *United Hous. Found.*, 421 U.S. at 853 (providing that the profits expected

must be in the form of a return on investment, rather than a consumptive use to be an investment contract).

In short, the alleged statements from the developers are about their respective networks and the behavior of the decentralized communities that contribute to these networks—not commitments to Cumberland's counterparties to undertake efforts to earn them a profit.  In fact, the *Binance* court rejected the SEC's nearly identical arguments that "*ongoing representations about the superiority of the platform* that allegedly gave the tokens their value" established that secondary-market purchasers had an expectation of profits from the developers' efforts.  *See Binance*, 2024 WL 3225974, at *22 (emphasis added).  Here, too, the SEC has failed to plausibly allege any facts showing that a secondary-market purchaser would understand the developer statements about a blockchain's superiority or general musings about the network to be commitments to earn them a profit.

### c. Statements within Cumberland's research reports and related materials

The SEC also alleges that Cumberland created research reports and sent emails ("Cumberland Materials") to its counterparties that provided updates on crypto projects and assets that, "*at times, imply* that [an asset's] value[] could increase."  Compl. ¶ 62 (emphasis added).  According to the SEC, the Cumberland Materials "reinforce" Cumberland's counterparties' reasonable expectation of profits based on the developers' efforts.  *See, e.g.*, *id*. ¶¶ 120, 143, 164, 193, 227.  However, one need only read the portions of the Cumberland Materials cited in the Complaint to see that they do not give rise to an expectation of profits based on the Token developers' efforts.  Nearly all of Cumberland's alleged statements merely address market trends, including price *decreases*—activity that is part and parcel of the market for any asset, whether a security or not.  *See*, *e.g.*, Compl. ¶ 193(d).

For example, in the commodities markets, prices are tracked, publicized, and compared against other commodities. Indeed, Cumberland's emails to counterparties discuss the token Ether ("ETH") in exactly the same way as the subject tokens, comparing them against each other. *See, e.g.*, *id.* ¶ 120(c) ("MATIC is up about 8% on the week, compared to ETH unchanged . . . ."); ¶ 227(a) ("On the desk, we continue to see healthy two-way flows in BTC and ETH, with a reduction in counterparty interest in altcoins."); *see also id.* ¶¶ 120(d), (g); 140(c); 164(b)–(c). Yet, the SEC has all but acknowledged that ETH is a commodity, not a security. *See, e.g.*, *In re eToro USA LLC*, Rel. No. 101001 (Sept. 12, 2024), https://tinyurl.com/mrky75ba (requiring eToro to cease and desist all crypto-asset trading other than Bitcoin, Bitcoin Cash, and Ether); *Coinbase III*, 2025 WL 78330, at *27 (Bibas, J., concurring) (stating that "[a]t oral argument in this very case, the SEC's lawyer refused to say whether Bitcoin and Ether are securities").[27]

Other alleged statements by Cumberland concern industry events, Compl. ¶¶ 143(a), 164(c), 193(g), and even *consumptive uses* for a token, *id.* ¶ 120(e). *See United Hous. Found.*, 421 U.S. at 853–54. None of these statements are the type of promotional statements that this Circuit has held give rise to a reasonable expectation of profits. *See, e.g.*, *Goodman*, 582 F.2d at 408 n.57 (finding that a housing development project was an investment contract because the defendants' brochure "featured detailed financial projections for the 'Healy Farm Project'. . . showing large figures for 'net income' and 'profit' which could reasonably [be] expected").

### 3. The SEC's theory lacks any limiting principle.

---

[27] Further, in 2024, the SEC approved trading of ETH ETFs under the rules for commodity-based trust shares, thus acknowledging that ETH is a commodity. *See* SEC Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amends. Thereto, to List and Trade Shares of Ether-Based Exchange-Traded Products Pursuant to Section 19(b)(1) of the Sec. Exch. Act, Exch. Act Rel. No. 34-100224 (May 23, 2024), https://tinyurl.com/9na929v4; *see also* Vicky Ge Huang and Caitlin Ostroff, *SEC Widens Accessibility of Crypto Investing With Approval of ETFs for Ether*, Wall Street Journal (May 23, 2024), https://tinyurl.com/3bsnap4c.

The SEC's position regarding the expectation of profits prong of the *Howey* test would also sweep in routine purchases by regular consumers, allowing the SEC to insert itself into all walks of commercial life. Every day, people purchase various types of assets, expecting the value of that asset will appreciate so that they can profit from resale later. People buy collectible items like Nike Jordan sneakers, baseball cards, and Beanie Babies expecting those items to appreciate. They may even do so because they expect the managerial efforts of others (e.g., Nike, Topps, and Ty, Inc.) to increase the items' value (for instance, by limiting the number of items sold, investing resources in advertisement, or, in the case of Nike, using novel technology to maximize jump height). While no one (including the SEC) would seriously argue that such collectibles are securities, under the SEC's misguided approach to *Howey,* the purchase of any of these items would qualify as an investment contract. The SEC's limitless application goes even farther, as it would mean consignment stores that resell those collectibles in the secondary market must register under the securities laws. The Court should not accept this reading of the securities laws. *See Secon*, 855 F.2d at 412 ("[Plaintiff's] reasoning would turn every contract to purchase something into a security. . . We do not accept this reading of the Act.").

C.     **The SEC fails to plausibly allege that any unidentified token transactions are "investment contracts."**

The SEC alleges that "Cumberland has made available for trading many crypto assets offered or sold as investment contracts," Compl. ¶ 73, yet fails to identify any beyond the five Third-Party Tokens. Instead, the SEC states that the five Third-Party Tokens are merely examples from a "non-exhaustive list." *See id*. ¶ 74. Cumberland and this Court are thus left in the dark about the full scope of the SEC's claims, including whether it may try to prove that transactions in other tokens qualify as investment contracts and how the SEC's case may unfold through discovery and trial. The SEC's decision to make factual allegations about only the five Third-Party Tokens

and no others should preclude it from seeking to later attempt to prove, in this action, that transactions in additional crypto assets are investment contracts.

Federal Rule of Civil Procedure 8 and *Howey*'s fact-specific analysis require the SEC to plead in its Complaint each crypto-asset transaction it views as an investment contract. Indeed, "not all crypto assets are the same. And their differences matter when evaluating whether a crypto asset is a security." *Coinbase III*, 2025 WL 78330, at *24 (Bibas, J. concurring); *see also Swanson*, 614 F.3d at 404–05 (interpreting *Iqbal* and *Twombly* and providing that a more "complex case" such as one involving "financial derivatives . . . will require more detail" to both give the defendant notice and allow a court to determine the facts before it are plausible (citing *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)). Without identifying any additional crypto assets that allegedly are at issue, the SEC has not given the Court sufficient information to determine whether the SEC plausibly can state a claim that transactions in those tokens are investment contracts. The SEC's claims have failed at the pleading stage where it alleged far more. *See, e.g., Binance*, 2024 WL 3225974, at *22 (dismissing the SEC's claims that secondary-market sales of Binance's token BNB constituted "investment contracts" notwithstanding 38 pages of facts detailing those purchases and sales).

The SEC has chosen to oversee this "industry through litigation – case by case, coin by coin, court after court," and must reap the consequences of that choice. *Id.* at *11. This includes pleading the identity of the crypto-asset transactions at issue and non-conclusory allegations as to why the economic reality of those crypto-asset transactions are "investment contracts." For years, the SEC has deprived the industry of such notice, and the Federal Rules of Civil Procedure do not allow it to continue to do so here.

## II. The SEC Fails To Plausibly Allege That Cumberland Is A Dealer.

At the heart of the SEC's Complaint is its allegation that Cumberland acts as an

unregistered securities dealer in violation of Section 15(a) of the Exchange Act. Its claim fails based on the threshold problem discussed above: Cumberland is not buying and selling *securities*. But its claim also fails for another reason—the SEC has not plausibly alleged that Cumberland is acting as a "dealer."

Congress defined "dealer" in the Exchange Act as "any person engaged in the business of buying and selling securities" for his or her "own account," but specifically excluded from the definition anyone whose buying and selling of securities is "not as a part of a regular business." 15 U.S.C. § 78c(a)(5). Commonly referred to as the "trader exception," this carve-out excludes those who do not "provide advice or services to other investors, but [are] instead acting in [their] own best interests," and therefore are not engaging in the "regular business" of dealing. *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990–91 (N.D. Tex. 2016).

Indeed, rendering services to customers lies at the core of "dealing." A dealer, like its Exchange Act counterpart, the broker, provides important services to its customers, but as principal, rather than as agent. The SEC has long subscribed to the notion that dealers and brokers *serve customers*. *See* Exch. Act Rel. No. 211 (May 6, 1935) (explaining that a "broker or dealer must disclose to his customer . . . whether he is acting as a dealer for his own account, . . . or as a broker"); SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, at XIV (1936) ("The characteristic activities of a dealer . . . [are that he] sells securities to his customer . . . or buys securities from his customer. . . .").

Courts, too, have confirmed that brokers and dealers in the securities market serve customers. *See, e.g., XY Plan Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) ("Broker-dealers effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee. . . . In connection with their services, broker-dealers often provide

advice and make recommendations about securities transactions and investment strategies."); *Chapel Invs.,* 177 F. Supp. 3d at 990 (emphasis added) (dealers "solicit[] investor clients, handl[e] investor clients' money and securities, render[] investment advice to investors, and send[] investors subscription agreements for their review and execution."); *In re Immune Pharms. Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) ("[A] dealer buys and sells securities from its customer and to its customer."); *Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*, 150 F. Supp. 3d 1219, 1226 (D. Nev. 2015) (explaining "dealer means buying and selling regularly in the service of others, rather than self-interestedly for one's own account" (citation and internal quotation marks omitted)). In fact, a federal district court recently vacated an SEC rule purporting to expand the statutory definition of "dealer" well beyond this historical understanding—i.e., entities providing services to customers. *See Nat'l Assoc. of Private Fund Mgrs. et al. v. SEC*, No. 24-cv-00250, 2024 WL 4858589, at *7 (N.D. Tex. Nov. 21, 2024) (explaining that "dealer and broker are sister-terms which must be read consistently" to "confirm[] the customer-order-facilitation interpretation").[28]

### A.    Cumberland's On-Exchange Trading is Not Dealing.

The SEC asserts that Cumberland acts as a dealer when executing "other Cumberland trading strategies" wherein Cumberland takes "long" or "short" positions in particular crypto assets for its own interests, even when trading on "third-party trading platforms" (i.e., crypto-asset exchanges). Compl. ¶¶ 66–67. The SEC has not, however, plausibly alleged facts that would make any of Cumberland's trading on crypto-asset exchanges fit within the dealer definition. Nor could it. Cumberland has no idea from or to whom it is buying or selling in these circumstances.

---

[28] *See also supra*, n.24 (explaining Cumberland is not both buying *and* selling investment contracts, i.e. "dealing").

*Chapel Invs.*, 177 F. Supp. 3d at 990. Cumberland does not provide any services. Cumberland does not "handl[e customer] money and securities." *Id*. Nor does Cumberland render "investment advice." *Id*. Cumberland simply trades at the then-prevailing market price of the asset, just like every other person or entity on the exchange. Thus, these counterparties cannot be considered "customers" to whom Cumberland is providing services, and Cumberland's trading therefore is not dealing. *See, e.g.*, *id.*; *see also* Louis Dreyfus Corp., SEC No-Action Letter, 1987 WL 108160, at *2 (July 23, 1987) (no-action letter providing that company actively trading and investing in secondary market was not a dealer because, among other things, "the Company does not know the identity of the ultimate purchaser or seller of the security nor does the purchaser or seller know the Company identity" and "does not make a market through Broker").

**B.      The Complaint Fails to Plausibly Allege Cumberland's Counterparty Trading is Dealing**

The Complaint also fails to plausibly allege that Cumberland's interactions or direct trading with counterparties via Call-In or Marea renders it a dealer. For example, the Complaint does not allege that Cumberland ever gave investment advice, extended credit, acted as an underwriter, or provided custody or brokerage services to its counterparties. *See XY Plan Network*, 963 F.3d at 248 ("In connection with their services, broker-dealers often provide advice and make recommendations about securities transactions and investment strategies."); *SEC v. Almagarby*, 92 F.4th 1306, 1316 (11th Cir. 2024).[29] And it does not allege that Cumberland traded for anyone's interests other than its own. *See Chapel Invs.*, 177 F. Supp. 3d at 990–91. Indeed, Cumberland

---

[29] *Almagarby* is one in a series of several cases concerning the toxic lending industry, whereby courts have considered allegations or evidence that a defendant acted as an underwriter by lending money to high-volume penny stock issuers in exchange for deeply discounted corporate bonds that they converted into new stock and sold to market, sometimes collecting transaction fees from the issuers. *See Almagarby*, 92 F.4th at 1316; *SEC v. Keener*, 102 F.4th 1328, 1332 (11th Cir. 2024). The facts that led those courts to conclude that the toxic lenders were dealers are wholly distinct from the allegations in this case.

discloses to its sophisticated counterparties that it is trading for its own interests and that those interests may actually be *adverse* to those of its counterparties. *See* Disclosures, Cumberland, https://www.cumberland.io/compliance/disclosures (last visited Jan. 15, 2025) ("Cumberland will enter into such transactions as principal only and will act solely in its own best interests, which may be adverse to the interests of such person.").[30]

The fact that Cumberland may derive profits from its trading does not alone render it a dealer. Compl. ¶ 39 (alleging that Cumberland "generated more than $400 million in revenue and more than $27 million in profits"). Courts and the SEC alike have explicitly rejected that argument. *See, e.g., SEC. v. Federated All. Grp., Inc.*, No. 93-cv-0895, 1996 WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996) ("The SEC's argument that the defendants made money by purchasing government securities and distributing them to individuals across the country and therefore are dealers assumes an excessively broad definition of a dealer."); SEC Denial of United Trust. Co. No-Action Request, 1978 WL 13781, at *2 (Sept. 6, 1978) (stating that "the level of a firm's activity with respect to . . . securities is not the measure of whether it is 'engaged in the business' of buying and selling . . . securities for its own account").

The Complaint alleges various ways that Cumberland attempts to "raise its public profile" and thus to "attract new counterparties" in the crypto-asset industry, including by "participat[ing] in industry conferences, pitch[ing] its services to potential new counterparties," and "giv[ing] media interviews." Compl. ¶¶ 63–64. But none of these activities are services to customers, much less the kinds of services that would render Cumberland a dealer under relevant precedent. Most

---

[30] Cumberland includes this disclosure on its website, which the Court may consider given the SEC's repeated references to Cumberland's statements on its website. *See* Compl. ¶¶ 35–37, 64, 143(i); *see Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (explaining that a court may consider documents external to a complaint where those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim").

importantly, the Complaint does not connect Cumberland's industry engagement with the specific trading alleged in the Complaint. *Id.* The SEC's allegations thus are facially insufficient to sustain a finding that Cumberland acted as a dealer with respect to the purported investment contracts alleged in the Complaint.

## III.   The Major Questions Doctrine Requires Dismissal of the Complaint.

Even if the SEC could plausibly allege that the Cumberland Transactions are "investment contracts" (they are not), the "major questions" doctrine requires dismissal of the Complaint. The doctrine is born from the principle that Congress must speak clearly to delegate to agencies expansive authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 700 (2022); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (observing that an economic impact of $50 billion sufficed to render the doctrine applicable in *Alabama Assoc. of Realtors v. Dept. of Health & Human Servs.*, 594 U.S. 758 (2021)).

Here, the crypto industry, once limited to niche traders, now attracts the country's largest financial institutions and nearly 20% of Americans, with a composite value of more than $1.5 trillion. [31]   *See Fact Sheet: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets,* (Sept. 16, 2022), https://tinyurl.com/4rjbr56f; *see also Coinbase III*, 2025 WL 78330, at *26 (Bibas, J., concurring) (stating that, at one point, "the crypto market swelled to $3 trillion"). And the industry's economic and political significance is rapidly growing. *See Coinbase III*, 2025 WL 78330, at *20 n.11 (acknowledging "that digital assets are a growing part of the financial sector and are emerging as an increasingly important form of online payment").

---

[31] Chair Gensler testified in 2021 that the crypto market had a value of over $1.5 trillion. *See* Gary Gensler, Chairman, *Testimony before the Subcomm. on Fin. Servs. and General Gov't.*, *U.S. House Appropriations Comm.* (May 26, 2021), https://tinyurl.com/ye235v5h.

Secondary markets are essential to the crypto-asset industry.  *See* Hester M. Peirce, Comm'r, *Remarks at the Secs. Enf. Forum: How We Howey* (May 9, 2019), https://tinyurl.com/2trkuw5h ("Without a functional secondary market, . . . . the primary market in the U.S. will wither and retail investors will not enjoy the protection our securities laws offer.") ("How We Howey").  But the SEC has rendered compliance with Section 15(a) impossible as a practical matter by refusing to promulgate any rules (or even guidance) on how to comply with registration requirements.  It then prosecutes well-meaning market participants for failing to navigate a non-existent path to registration.  *See id*. ("The SEC has yet to provide guidance to the public or FINRA on any of the core questions [regarding registration].); *Coinbase III*, 2025 WL 78330, at *20–29 (Bibas, J., concurring) (explaining how securities laws fit poorly with crypto assets and that the SEC "refuses to recognize this [and thus] breed uncertainty," leaving firms "to cross their fingers and pray that the agency does not fault them").[32]

The Complaint is deafeningly silent on this Catch-22.  When pressed about the impossibility of registration a few months ago at an oral argument on Coinbase's petition for SEC rulemaking, the SEC blithely responded:  "The securities framework is not premised on compliance being possible."  Sept. 2024 *Coinbase* Tr. at 27:4–10.  Indeed, the SEC's regulation-by-enforcement agenda makes apparent that it does not want compliance to be possible—it wants to stop the crypto-asset industry in its tracks.  *See supra*, How We Howey; *see also Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring) (stating the SEC is "pursuing a de facto ban through enforcement").

---

[32] *See also* Comm. on Cap. Mkts. Regul., *Cryptoasset Trading Platforms Cannot Register as Securities Exchanges*, at 1, (June 6, 2023) ("[T]here are virtually no cryptoassets that a cryptoasset trading platform registered as a securities exchange could list and trade . . . even if there were cryptoassets registered as securities, existing SEC rules and guidance make it impossible for cryptoasset trading platforms to register and comply with the requirements applicable to securities exchanges.").

Because the SEC has no authority to outlaw crypto assets, the Court should reject its interpretation of "investment contract" as a means to do so. As explained *supra*, the SEC's interpretation of "investment contract"—a "catch all" term, *see Peoria Union*, 698 F.2d at 324— is divorced from the statutory meaning and decades of Supreme Court precedent examining it. In *West Virginia*, the Supreme Court rejected the EPA's expansive interpretation of a "gap filler" (i.e., a "catch-all") statute where the logical end-point of the regulation would have been forcing coal plants to cease production altogether. 597 U.S. at 724; *see also FDA v. Brown & Williamson Tobacco Corp.* (rejecting the FDA's expansive reading of its authority over drugs and devices to *ban* tobacco products). Indeed, as Judge Bibas recently acknowledged, "[i]f the SEC were to promulgate a rule banning crypto assets, it would surely face legal challenges." *Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring). It stands to question how the SEC, "an agency whose mission is maintaining fair, orderly, and efficient markets[,] is authorized to ban an emerging technology" such as crypto assets without clear congressional authority. *Id.* (citing *West Virginia*, 597 U.S. at 744).

Moreover, even a cursory review of Congress's legislative agenda in recent years reveals the absence of clear congressional authorization to ban crypto assets. Congress has considered dozens of proposals regarding regulation of the crypto-asset industry, none of which vest the SEC with the authority to solely regulate crypto assets, much less ban them.[33] As one SEC Commissioner recognized, "if we seriously grappled with the legal analysis and our statutory authority, . . . we would have to admit that we likely need . . . more clearly delineated, statutory

---

[33] *See, e.g.*, Fin. Innovation and Tech. for the 21st Century Act ("FIT21"), H.R. 4763, 118th Cong. (2023) (establishing guidelines for joint CFTC and SEC regulation); Responsible Fin. Innovation Act, S. 2281, 118th Cong. (2023) (allocating enforcement authority amongst the CFTC, and SEC, banking agencies)); Digital Comms. Consumer Prot. Act of 2022, S. 4760, 117th Cong. (2022) (amending CEA to provide CFTC regulatory jurisdiction over the "digital commodity" spot market); Digital Comm. Exch. Act of 2022, H.R. 7614, 117th Cong. (2022) (providing for the regulation subject to CFTC oversight).

authority to . . . require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else." Hester M. Peirce, Comm'r, *Outdated: Remarks Before the Digital Assets at Duke Conference,* (Jan 20, 2023), https://tinyurl.com/yvwra75m.

Recent judicial decisions ruling that the SEC's expansive interpretation of its authority does not implicate the major questions doctrine are, respectfully, unpersuasive. The *Terraform Labs* court's reasoning conflicts with recent Supreme Court precedent in the *Nebraska* and *Alabama Assoc. of Realtors* cases. *See Terraform Labs*, 684 F. Supp. at 188–90 (incorrectly suggesting the doctrine is limited to "energy and tobacco industries"). And ironically, in rejecting the doctrine's applicability, the *Binance* court reasoned that "[t]he SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosure to investors." 2024 WL 3225974, at *42. Yet this is exactly the power the SEC is exercising here: "banning crypto" "through enforcement." *Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring). The Court should end the SEC's slash-and-burn enforcement agenda in an area over which it has no authority.

## IV. The SEC's Enforcement Action Violates Cumberland's Due Process Rights.

The SEC violates Cumberland's due process rights, warranting dismissal of the Complaint. It does so in two ways: (1) refusing to provide guidance on the crypto-asset transactions it considers securities and Section 15(a)'s registration requirements for purported dealers (and then suing Cumberland for failing to comply); and (2) pursuing this enforcement action based on an application of the *Howey* test in a manner that departs from its past application of the test to secondary-market transactions of crypto assets.

A bedrock of the American legal system is the fundamental principle that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (holding the "requirement of clarity in

regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment"); *see also Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). Regulated parties are not required to "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012). To the contrary, "[e]ntities regulated by administrative agencies have a due process right to fair notice of regulators' requirements." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1105 (9th Cir. 2014).

The SEC's "regulation" of the crypto asset industry has not provided Cumberland with fair notice. To date, the Agency "has offered no meaningful guidance on which crypto assets it views as securities." *Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring).[34] And its positions espoused in enforcement actions are "confusing at best." *Id.* at *27. (observing how the SEC has sued multiple exchanges days apart yet was inconsistent in which crypto assets it alleged as securities). Indeed, if the SEC's position on crypto assets has been so clear, it begs the question why it took the agency *six* years of investigating Cumberland (who cooperatively provided thousands of documents and multiple days of employee testimony) to initiate this lawsuit.

Furthermore, the SEC has resisted providing any explanation as to how to comply with the registration requirements at issue here. *See, e.g.*, *supra*, How We Howey (criticizing the Commission for failing its duty "as a regulator to provide the public with clear guidance as to *how* people can comply with our law"). Instead, the SEC has pursued firm after firm, seeking tens of millions of dollars in penalties and permanent injunctive relief that would halt their businesses. In a hearing before the Third Circuit, Judge Bibas observed the obvious due process concerns with

---

[34] *See supra*, Game Stopped Hr'g at 12 ("[R]ight now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission …"); *see also supra*, Gensler Letter at 1, 3.

the SEC's approach:

> [T]here are some serious notice concerns with, 'We might hit you with serious civil penalties, but we won't tell you what will trigger the civil penalties . . . .' There are serious problems that [the SEC is] not just seeking to make people comply, [the SEC is] seeking to penalize people who don't comply with things they don't know.

September 2024 *Coinbase* Tr., 28:11–14; 17–20. And in his later concurring opinion on the issue, Judge Bibas was clear: "the SEC's haphazard enforcement strategy of targeting entities that are trying to follow the law does not give [them] the notice that due process requires." *Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring).

In addition, the Complaint should be dismissed because the SEC's application of *Howey* to Cumberland's transactions in the Third-Party Tokens and other non-identified crypto assets departs from its past regulatory conduct concerning secondary-market, crypto-asset transactions. As discussed, *supra*, the SEC has historically taken the stance that it lacks the requisite framework to regulate exchanges and secondary-market intermediaries. *See supra*, page 6. And the DAO Report "gives guidance only about . . . tokens that look just like stocks" but is "silent on other assets" like the Third-Party Tokens. *Coinbase III*, 2025 WL 78330, at *28 (Bibas, J., concurring). Thus, "the SEC's application of the *Howey* test" to the Cumberland's transactions at issue "sufficiently depart[s] from its past conduct to raise fair-notice concerns" requiring the Complaint's dismissal. *Id.* at *10 (majority opinion addressing Coinbase's due process argument). Seeking to punish Cumberland for failing to register under these circumstances is unjust and a violation of due process and warrants dismissing the Complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SEC's Complaint. To the extent the Court finds dismissal unwarranted, the Court should limit the SEC's Complaint to the Third-Party Tokens identified therein.

Dated: January 15, 2025

Respectfully submitted,

 /s/ Jonathan D. Cogan
Jonathan D. Cogan
Michael S. Kim
Jeremy O. Bressman (*pro hac vice*)
Brandon C. Bias (*pro hac vice forthcoming*)
**KOBRE & KIM LLP**
800 Third Avenue
New York, NY 10022
(212) 488-1200
Jonathan.Cogan@kobrekim.com
Michael.Kim@kobrekim.com
Jeremy.Bressman@kobrekim.com
Brandon.Bias@kobrekim.com

Evelyn Baltodano-Sheehan (*pro hac vice*)
**KOBRE & KIM LLP**
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6100
Evelyn.Sheehan@kobrekim.com

Sydney S. Johnson (*pro hac vice*)
**KOBRE & KIM LLP**
1919 M St. NW, Suite 410
Washington, DC 20002
(202) 664-1900
Sydney.Johnson@kobrekim.com

*Attorneys for Defendant Cumberland DRW LLC*